```
                    UNITED STATES DISTRICT COURT

                     SOUTHERN DISTRICT OF OHIO

                          WESTERN DIVISION

                               - - -

 MARK R. HOOP, et al.,         :

              Plaintiffs,      : CIVIL NO. C-1-00-869

     -vs-                      : Second Day of Trial

 JEFFREY W. HOOP, et al.,      : Tuesday, February 3, 2004

              Defendants.      : Cincinnati, Ohio

                               - - -

                 EXCERPT OF TRIAL PROCEEDINGS
             PROFFERED TESTIMONY OF RICHARD LUTHER
           BEFORE THE HONORABLE SUSAN J. DLOTT, JUDGE

                               - - -


 For the Plaintiffs:  Alfred J. Mangels, Esq.
                      4729 Cornell Road
                      Cincinnati, Ohio  45241

                      Timothy A. Magee, Esq.
                      130 Sherman Drive
                      Findlay, Ohio  45840


 For the Defendants:  Stella B. House, Esq.
                      Post Office Box 422
                      Manchester, Kentucky  40962-0422




 Court Reporter:      Julie A. Wolfer, RDR, CRR

                               - - -
```

Proceedings recorded in stenotype.
Transcript produced using computer-aided transcription.

<u>PROCEEDINGS</u>

\* \* \*

(Proffer by plaintiffs.  Jury not present.)

RICHARD LUTHER

EXAMINATION

BY MR. MANGELS:

Q. Mr. Luther, what we're going to do is to ask you some questions again about your background and some questions about the possible opinions you might hold for consideration as to your qualifications as an expert witness.

Now, again, you've indicated that you spent eight years at Diamond Tool and Die as an apprentice, and then describe to us what you were doing while you were with Diamond Tool and Die precisely.

A. Designing and actually building, hands-on building tools, plastic injection molds, and die cast dies.

Q. Can you give us some idea of how many of these dies you might have been working with over that span, approximately?

A. I know 50 to a hundred.  I wouldn't know.

Q. It's at least 50 is what you're saying, then?

A. Yes.  Yes.

Q. Would that have been in connection with the production of these devices from the start or at certain phases?  Describe again what steps you would undertake in connection with this work.

```
 1  A.  Well, that would be from the very beginning of concept of a
 2  part design and actually building the tooling to make that
 3  design, make parts, and production.
 4  Q.  All right.
 5          MS. HOUSE:  Can I -- can we go off the record for a
 6  second?
 7          THE COURT:  You can put me on the record, Julie.  I
 8  was just sitting here typing.
 9          MS. HOUSE:  I just wondered with the proffer, it seems
10  like he's going more into his qualifications.  Should that have
11  been what his testimony would have been if he had been allowed
12  to testify?
13          THE COURT:  Yeah, he would have qualified him as a
14  witness.  He would have, yeah, first had to qualify him as a
15  witness.
16          MS. HOUSE:  Right.  But so since you've already --
17          THE COURT:  And then the essence of what his testimony
18  was going to be.
19          MS. HOUSE:  That's what I expected, yeah, that it was
20  going to be the essence of what his testimony would have been.
21          THE COURT:  Right, the essence of what his testimony
22  would have been.  But I have reservations about -- I also have
23  reservations about his qualifications as a witness in this
24  field.
25          MS. HOUSE:  Okay.  And its relevance to this case.
```

1  BY MR. MANGELS:
2  Q.  So, again, just reviewing, you were with Diamond Tool
3  approximately eight years as an apprentice, and during that
4  time you worked on at least 50 dies from the preparation stage
5  through the final approval?  Would that be correct?
6  A.  Yes.
7  Q.  All right.  And these die would have been used for making
8  what kind of articles?
9  A.  Like from electronics to consumer parts.
10 Q.  Have you seen the eagle fairing guards that we're talking
11 about in this case?
12 A.  Yes, I have.
13 Q.  Were you present at a time they were being cast?
14 A.  Yes, I was there.
15 Q.  All right.  You went from Diamond Tool and spent 15 years
16 with Universal Tool.  That's correct, is it?
17 A.  Yes.
18 Q.  And what did you do with Universal Tool?
19 A.  I actually went out and did the sales and estimating for
20 the construction of dies and molds.
21 Q.  Dies and molds for what purpose?  What would they be used
22 for?
23 A.  To make metal parts and plastic parts.
24 Q.  Do you have any rough estimate as to how many tools you
25 would have been estimated over that time span?

1  A.  I would say a couple thousand.  Two thousand.
2  Q.  And you went to -- what sort of estimation would you
3  perform?  What is the information that you would be providing?
4  A.  What the materials costs would be, what the design costs
5  and development, what the actual hours, labor costs would be to
6  bring tooling to production --
7  Q.  And --
8  A.  -- to a customer's satisfaction.
9  Q.  To whom would you give these estimates?
10 A.  I would give them to our customers.
11 Q.  And the customers would then approve them, and what would
12 happen at that point?
13 A.  Well, the customer would have to approve the end product
14 before we would get paid.
15 Q.  All right.  Now, after Universal Tool you joined Yoder and
16 have been with them for 13 years as director of engineering,
17 and could you tell us what it is that you do at Yoder
18 Industries?
19 A.  Well, at Yoder Industries I am on the other end.  I'm on
20 the procurement side where I actually go to vendors like the
21 place I worked before and purchase tooling.
22 Q.  Do you have any rough feel for how many --
23 A.  So I have to -- I have to estimate what tooling costs are
24 so that I -- with my experience so I don't get overcharged for
25 tooling.

| | |
|---|---|
| 1 | Q. And with how many dies have you been involved over that |
| 2 | span of years you were with Yoder? |
| 3 | (Judge Dlott left the courtroom.) |
| 4 | A. Well, I estimated over 300 jobs last year, if that tells |
| 5 | you anything, and all of them require tooling. |
| 6 | Q. What type of tooling would they require? |
| 7 | A. Metal. To produce metal parts. |
| 8 | Q. Die casting dies? |
| 9 | A. Die casting dies. |
| 10 | Q. All right. And these would be two-piece dies in which hot |
| 11 | metal is injected? |
| 12 | A. Yes. |
| 13 | Q. All right. I want to show you some photographs that have |
| 14 | been identified as Joint Exhibit 27. We have two photographs |
| 15 | showing wax renderings that were utilized in connection with |
| 16 | Mr. Hoop's project to prepare a die casting die for die casting |
| 17 | heat, and he had this configuration. Are you familiar with |
| 18 | this technique of preparing a die casting die? |
| 19 | A. I am somewhat. It's the wax rendering is done by hand for |
| 20 | the most part. |
| 21 | Q. Yes. Are there other ways of doing this to prepare a die |
| 22 | for die casting? |
| 23 | A. There is a digitizing process where you would actually make |
| 24 | a solid model of that part which would be actually engineering |
| 25 | data that could be used by CNC machinery to machine that into |

1   steel.
2   Q.  All right.
3   A.  The reverse image.
4   Q.  So machining into steel, you would have a block of steel
5   and you'd give this machine these instructions from the digital
6   data and it would cut the outline that was defined by those
7   instructions; is that accurate?
8   A.  Right.
9   Q.  I want to show you these photographs, also a part of Joint
10  Exhibit 27, one here is entitled Eagle Fairing Guard Die Cast
11  Mold and another one which is untitled but apparently shows
12  another portion of the mold.  Could you describe to us what
13  these particular photographs show?
14  A.  Well, that's makes up the complete die.  You have the one
15  part is what we call the ejector half, and the other is the
16  cover half.  And in this case the cover half has all the detail
17  in this which is the eagle detail.  And then the other part is
18  the part that has the contour which fits on the fairing
19  which --
20  Q.  And have you seen this die in its actual -- actual physical
21  form?
22  A.  Yes, I have.
23  Q.  And have you seen parts molded from it?
24  A.  Yes, I have.
25  Q.  And in what capacity were you engaged at the time that you

1  were observing die cast parts being cast utilizing this mold?
2  A.  Consulting.
3  Q.  All right.  Based on your experience with die cast dies
4  over the past approximately 40 years, would you have an opinion
5  as to what a die of this nature would cost based on that
6  familiarity plus the fact that you've actually seen this die
7  and have seen it die cast parts?
8  A.  Yeah.  Just the die itself, not including the what it took
9  to get to that point as far as -- would be in the neighborhood
10 of $80,000 to $90,000.
11 Q.  When you say not to get to that point, what is it that you
12 mean?  You said the die itself but not what it takes to get to
13 that point.
14 A.  Well, there's no -- initially there's no part drawing,
15 there's no dimensions, there's nothing to work to.
16 Q.  What would you need to start with?
17 A.  I would -- would go to a solid model, have somebody
18 generate a solid model of the part.
19 Q.  And then what would you do with that solid model?
20 A.  Well, it has to be split for die building.  The parting
21 lines have to be defined which is not a straight parting line.
22 It's ever changing.  There's no straight line on the part so --
23 Q.  When you say parting line, would you describe what that
24 means?
25 A.  If you look at the part, it's the part that goes all the

1  way around the outside where the two mold halves go together.
2  Q.  Okay.  It's the line --
3  A.  It's a line where the two molds halves separate.
4  Q.  Okay.  Now, I also want to show you another pair of
5  photographs from Joint Exhibit 37 showing what is designated as
6  a Right Side Bump Die.  Are you familiar with dies of that
7  type?
8  A.  Yes.
9  Q.  Do you know what they do?
10 A.  That actually final forms the part to fit something.
11 Q.  And by -- have you -- could you arrive at some estimate of
12 what the cost might be for preparing a die like this?
13 A.  I would say in the neighborhood of fifteen, twenty thousand
14 dollars.
15 Q.  All right.  I also want to show you two photographs, also a
16 part of Joint Exhibit 27, that have the title Secondary
17 Operation Holding Fixtures.  Have you seen or used fixtures
18 like that before?
19 A.  Yes.
20 Q.  All right.  And based on what you know about the part
21 involved in this case and the pictures that you're looking at
22 here, did you have a -- an estimate of what it would cost to
23 prepare these devices, these holding fixtures?
24 A.  I would say $15,000.
25 Q.  All right.  Finally, in this particular case Mark Hoop had

```
 1  arrived at a cost for his -- his die which is the die that you
 2  just saw in these photographs entitled Eagle Fairing Guard Die
 3  Cast Mold.  If I were to indicate to you that Mr. Hoop had
 4  assigned a price for these dies which includes materials plus
 5  his labor of $49,500, would you consider that to be a
 6  reasonable cost for such a device?
 7  A.  That would be a low cost, very -- I couldn't -- I couldn't
 8  buy that for that price.
 9  Q.  Would you take on a job like this for that price?
10  A.  No, I would not.
11  Q.  So if he were to offer that price to someone else, would
12  you think that that was a bargain?
13  A.  I certainly would.
14  Q.  And your estimate as to what it would cost would be in the
15  nature of $80,000?
16  A.  Yes.
17  Q.  All right.  Just a second, please.
18      Yes.  Final question, Mr. Luther.  Do you feel that you
19  qualify as an expert by virtue of your knowledge, skill,
20  experience, training, or education in the field of die casting
21  dies; that you are qualified?
22  A.  Absolutely.
23  Q.  All right.
24          MS. HOUSE:  Well, I don't know if I'm allowed to, but
25  I would object to that question.  I think that is the ultimate
```

1 | question for the Judge.
2 |     MR. MANGELS:  That's fine.
3 |     MR. MAGEE:  That's just straight out of the rule.
4 |     MS. HOUSE:  Okay.
5 | A.  I don't know if I could find anybody that had any more
6 | experience.
7 |     MR. STEVEN HOOP:  I'm sure there's plenty of them out
8 | there.
9 |     MR. MANGELS:  Did you have any questions, Miss House?
10 |     MS. HOUSE:  Yes, I have a few.  Let me grab my notes.
11 |         EXAMINATION
12 | BY MS. HOUSE:
13 | Q.  You indicated that you were hired as a consultant?
14 | A.  Yes.
15 | Q.  Who hired you?
16 | A.  Accro-Cast.
17 | Q.  Okay.  And did Mark Hoop or his attorneys hire you to do
18 | any consulting relating to this specific die?
19 | A.  No.  I worked through Accro-Cast in working with -- I met
20 | with Mark and discussed the project.
21 | Q.  So Accro-Cast paid you for your consulting services?
22 |     And what's -- do you know what Accro-Cast's role is or
23 | relationship is to these eagle fairing guards?
24 | A.  Yeah.  They're the die caster, I understand.
25 | Q.  Okay.  And how long did you work for Accro-Cast?

| | |
|---|---|
| 1 | A. Consulting probably about five years and I still do. |
| 2 | Q. And you still do consulting work for Accro-Cast? |
| 3 | A. Um-hmm. And anybody else that wants it. |
| 4 | Q. Okay. And what do you charge for your consulting services? |
| 5 | A. It's on a job-by-job basis. I really don't -- |
| 6 | Q. Do you know how much Accro-Cast has paid you for your |
| 7 | consulting services in this particular matter? |
| 8 | A. No, I don't because it's -- there's a lot of other jobs |
| 9 | that are involved at this time. It's not broke out. |
| 10 | Q. So it's commingled with a lot of other consulting work that |
| 11 | you're doing for Accro-Cast? |
| 12 | A. Right. |
| 13 | Q. Is Accro-Cast paying you to be here today? |
| 14 | A. No, they are not. |
| 15 | Q. Okay. Is Mark Hoop paying you to be here today? |
| 16 | A. Yes, he is. |
| 17 | Q. And how much are you being paid to be here today? |
| 18 | A. I'm not sure what we discussed. I mean, it was a hourly |
| 19 | with expenses. |
| 20 | Q. Where do you live? |
| 21 | A. Vandalia, Ohio. |
| 22 | Q. Okay. How far is that from here? |
| 23 | A. I don't know exactly. Sixty miles maybe. |
| 24 | Q. So you drove here today? |
| 25 | A. Um-hmm. |

```
 1   Q.  Okay.  Did you -- are you the individual who signed the
 2   confidential disclosure agreement regarding this particular
 3   project for Accro-Cast?
 4   A.  I don't recall.  If my name is on it, it could be, but I
 5   don't recall that.
 6   Q.  So do you remember, ever recall seeing a confidential
 7   disclosure agreement?
 8   A.  Not right offhand.
 9   Q.  And you're not actually an employee of Accro-Cast, then, if
10   I'm understanding it correctly, you're more like a contract --
11   you provide contract consulting services for Accro-Cast?
12   A.  Yes.
13   Q.  Okay.  And did you have any occasion to actually be present
14   or make any observations when Mark Hoop was actually building
15   this particular die?
16   A.  No, I did not.  I've never been to --
17   Q.  So --
18   A.  -- Mark's --
19   Q.  Mark's shop?
20   A.  -- shop, no.
21   Q.  Okay.  So you would have no personal knowledge regarding
22   the actual time and effort spent building this particular die
23   by Mark Hoop?
24   A.  No.
25   Q.  Okay.  And you would have no actual knowledge regarding the
```

| | |
|---|---|
| 1 | time and efforts that he would have spent in demonstrating |
| 2 | producibility of the eagle fairing guards? |
| 3 | A.  No. |
| 4 |       MS. HOUSE:  No further questions. |
| 5 | EXAMINATION |
| 6 | BY MR. MANGELS: |
| 7 | Q.  One final question.  You indicated you were associated with |
| 8 | Accro-Cast as a consultant.  Do you also hold a position with |
| 9 | Accro-Cast? |
| 10 | A.  Yes, I do. |
| 11 | Q.  And what is that position? |
| 12 | A.  I'm on the board with Accro-Cast. |
| 13 | Q.  Board of directors? |
| 14 | A.  Board of directors.  My brother owns that company. |
| 15 | EXAMINATION |
| 16 | BY MS. HOUSE: |
| 17 | Q.  I'm sorry, your brother owns Accro-Cast? |
| 18 | A.  That's right. |
| 19 | Q.  And to your knowledge does Accro-Cast have any personal |
| 20 | investment in this particular project? |
| 21 | A.  Yes, I believe they do. |
| 22 | Q.  Okay.  And do you know the details of that? |
| 23 | A.  No. |
| 24 | Q.  So we would need to talk to a representative of -- an |
| 25 | actual probably representative of Accro-Cast, not just a member |

```
 1  of the board of directors, to get those details?
 2  A.  Yes.
 3  Q.  Who would be the person most knowledgeable who might be
 4  able to provide us with that information?
 5  A.  Probably Junior Mosely.
 6  Q.  Okay.  Thank you.
 7          MR. MANGELS:  No further questions.
 8      (Proceedings adjourned at 4:18 p.m.)
 9                              - - -
```

## C E R T I F I C A T E

I, Julie A. Wolfer, the undersigned, do hereby certify that the foregoing is a correct transcript from the record of the proceedings in the above-entitled matter.

                              s/Julie A. Wolfer
                              Julie A. Wolfer, RDR, CRR
                              Official Reporter