IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI

04 FEB 23 PM 4: 05

| | | |
|---|---|---|
| Mark R. Hoop, *et al.*, | ) | |
| | ) | Civil Action No. C-1-00-869 |
| Plaintiffs, | ) | |
| | ) | District Judge Susan J. Dlott |
| v. | ) | |
| | ) | **PLAINTIFFS' RENEWED MOTION** |
| Jeffrey W. Hoop, *et al.*, | ) | **FOR JUDGMENT AS A MATTER OF** |
| | ) | **LAW OR, IN THE ALTERNATIVE, FOR** |
| Defendants. | ) | **A NEW TRIAL OR AMENDMENT OF** |
| | ) | **THE JUDGMENT** |
| | ) | |

Plaintiffs, by and through their attorneys, and pursuant to the provisions of Fed. R. Civ. P. 50, hereby renew their oral motion made at the close of the evidence for judgment in their favor as a matter of law on the ground that based upon the evidence presented reasonable minds could not differ as to the facts and that the following judgments should be entered:

That Mark Hoop and Lisa Hoop are the joint inventors of the patented design;

That Lisa Hoop is the author of the line drawing copyright;

That Mark Hoop and Lisa Hoop are the joint authors of the sculpture copyright;

That Mark Hoop and Lisa Hoop are entitled to compensation from Defendants for unpaid services Mark and Lisa Hoop rendered at Defendants' behest, Lisa Hoop in the amount of $1,137.50 for services in connection with packaging and web site artwork and Mark Hoop in the amount of $37,500.00 for diemaking services;

That Defendants' patent is invalid in that it does not name the correct inventors of the patented design;

That Defendants' infringement claims be dismissed;

That the preliminary injunction heretofore entered be vacated; and

That Jeffrey Hoop and Steven Hoop be found to have infringed Plaintiffs' patent and copyrights.

In the alternative, Plaintiffs move the Court for an Order pursuant to the provisions of Fed. R. Civ. P. 59 granting a new trial at to all the issues in this case, or for amendment of the judgment to reflect the above-listed conclusions. The basis for a new trial is that the jury that heard the evidence in this case failed to follow and correctly apply the Court's instructions on the law to be applied and that as a result the jury reached a verdict that was internally inconsistent, evidencing jury confusion that led to findings and conclusions that are not supported by the evidence and that are contrary to law.

Respectfully submitted,

Alfred J. Mangels (0015981)
4729 Cornell Road
Cincinnati, Ohio 45241
Tel.: (513) 469-0470


Timothy A. Magee (0066023)
347 N. Main Street, Suite #3
Bowling Green, Ohio 43402
(419) 353-1856

Trial Attorneys for Plaintiffs

## MEMORANDUM IN SUPPORT

The following facts are undisputed, based upon the evidence produced at trial:

1. That Defendants conceived an idea for a product in the form of an eagle that was to be a die cast item to be applied on opposite outer sides of a motorcycle fairing to serve as a guard against scratches of the outer side fairing surfaces;

2. That Defendants disclosed their product idea to Mark Hershberger, their friend of many years, and asked him to generate several rough sketches, which he did because Defendants were not adept at making drawings;

3. That Defendants met with Lisa Hoop and Mark Hoop for their graphic arts and diemaking skills and gave them Mark Hershberger's rough sketches to show them what they had in mind in the way of a fairing guard;

4. That because there were doubts whether a guard having the necessary curvature to properly fit on the fairing could be produced, Mark Hoop proposed that if Defendants paid Mark's materials costs and his out-of-pocket expenses, he would attempt to make a die, and if he was successful in doing so Defendants would pay for his time and efforts, but if he was not successful in doing so Defendants would not owe Mark for his time and efforts;

5. That over a period of several months Lisa Hoop drew several eagle designs and ultimately arrived at a two-dimensional eagle design that Defendants accepted;

6. That Mark Hoop developed a three-dimensional eagle design based upon Lisa Hoop's two-dimensional drawing by adding surface details, and he successfully produced a die casting die from which three-dimensional eagle fairing guards were produced and accepted by Defendants;

-3-

7. That each of Plaintiffs and Defendants claimed that they were the joint inventors of the three-dimensional eagle design, and Plaintiffs and Defendants each filed respective patent applications and received respective design patents for the same three-dimensional ornamental design;

8. That Mark Hoop and Lisa Hoop applied for and received respective copyright registrations for the two-dimensional eagle design developed and drawn by Lisa Hoop and for the three-dimensional eagle design that incorporated Lisa Hoop's two-dimensional design and Mark Hoop's three-dimensional and surface features that were additions to the Lisa Hoop two-dimensional design.

Attached to and forming part of this Memorandum is the Declaration of Alfred J. Mangels, attesting to the authenticity of appended pages    of the transcript of the trial testimony of Jeffrey W. Hoop, which the undersigned understands has been filed with the Court by the Court Reporter. References to that testimony are identified herein in the form "Tr., p.___, l.___."

## I.
## THE JURY MISAPPREHENDED THE COPYRIGHT AUTHORSHIP ISSUES

Despite the Court's instruction on the law of copyright authorship, the jury found that Lisa Hoop was not the author of the line drawing copyright (Answer to Interrogatory No.14) and that Lisa Hoop and Mark Hoop were not the authors of the three-dimensional sculpture copyright (Answer to Interrogatory No. 19). In reaching those conclusions the jury failed to follow the Court's copyright authorship instruction (Jury Instructions, page 34, "Author" – Defined) that stated as the law to be applied:

A person who conceives an idea is not an author for purposes of copyright law. An author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression that is entitled to copyright

-4-

protection.   Providing sketches, ideas, or supervision over material that is copyrightable is not sufficient to make on a joint author.

And the Supreme Court has held similarly in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989)

One possible explanation for the jury's answers is that they concluded that the originator of an idea that is incomplete as to the details of its form, such as Defendants' idea was, is the author of the tangible expression of that idea, despite that the expression of the idea was generated and reduced to tangible form by another person as a drawing – a conclusion clearly at odds with the law as given by the Court.  Another possible explanation is that the jury considered the copyrighted works to be works made for hire.  But that conclusion also is clearly at odds with the law as given by the Court because the testimony clearly showed that neither of Plaintiffs was an employee of Defendants, nor had either of Plaintiffs signed a document transferring their copyright rights to Defendants.

This case presents copyright authorship and ownership issues that are the same as those addressed by the Supreme Court and that it resolved in favor of the sculptor, *Id.*  Those issues involved copyright ownership in a case involving a commissioned sculptural work to which the commissioning party made suggestions to the sculptor for changes to the work during the time it was being prepared.  The Supreme Court said, "Transforming a commissioned work into a work by an employee on the basis of the hiring party's right to control, or actual control of, the work is inconsistent with the language, structure, and legislative history of the work for hire provisions."  *Id.*, at 750.  Consequently, each of the possibilities posited above regarding the jury's conclusions is contrary to law and therefore the jury's conclusions concerning copyright authorship are incorrect.

## II.
## THE JURY MISAPPREHENDED THE PATENT INVENTORSHIP ISSUE

The evidence established that Defendants conceived a bare idea, an incomplete concept of a fairing guard because the concept was not fleshed out in sufficient detail to constitute a specific design suitable for patenting. Indeed, Defendants themselves drew no drawings or sketches (Tr. p. 98, l. 23 – p.99, l.19). Instead, their friend Mark Hershberger made all the sketches that Defendants provided to Plaintiffs (Tr. p. 100, l.16 – p.101, l.17), which were the only sketches provided to Plaintiffs by Defendants. But the Hershberger sketches did not resemble the final design arrived at by Lisa Hoop. In fact, the Hershberger sketches were of a different design from that of Lisa Hoop's, and they were designs of Hershberger's authorship, not that of Defendants. Because Defendants themselves never made a drawing, they cannot be the originators of the ornamental design that was ultimately patented, a three-dimensional ornamental design that evolved over time to include both Lisa Hoop's two-dimensional ornamental design and Mark Hoop's three-dimensional additions to that two-dimensional ornamental design.

The overwhelming evidence adduced at trial, both testimonial evidence as well as documentary evidence, clearly showed that the patented design was the product of Lisa and Mark Hoop's creative efforts, not those of Defendants and not those of Mark Hershberger. Consequently, neither Defendants nor Mark Hershberger is an inventor of the ornamental design that is shown in the parties' patents. Plaintiffs' patent identifies the true inventors and is therefore valid, whereas Defendants' patent directed to the same ornamental design invention does not identify the true inventors of that design and is therefore invalid.

In that regard, the jury was instructed that

The word 'invention' refers to a concept that is complete, rather than merely to a concept that is only substantially complete…. Conception of an invention is the formation in the mind of the inventor of a definite and permanent idea of the complete invention, as it is to be applied in practice. *A conception of a particular invention must include every feature or limitation of the invention that is shown in and claimed by the inventor in his patent.* Therefore, you must look

to what is shown and claimed to be the invention in the design patents of the parties in order to determine what design was conceived, and who it was that conceived the ornamental design invention that is shown and claimed in the patent. (emphasis added).

Clearly, the design shown in the patents obtained by the parties is the design that is the product of Lisa Hoop's two-dimensional design as modified by Mark Hoop's three-dimensional details. Neither Defendants nor Mark Hershberger contributed all of the many and significant details that distinguished the patented design from the designs reflected in the Hershberger sketches. Those details were identified and described by Professor Hammond, Plaintiffs' expert witness, who at great length distinguished the designs. An ordinary observer would certainly note those differences and would therefore not be deceived into mistaking any of the Mark Hershberger designs for the Lisa Hoop final design, which is the test for similarity of design as embodied in the Court's instructions on the law (Jury Instruction, page 21, "Patent 'Inventor' Defined"). By incorrectly determining the inventorship issue the jury was led also to incorrectly assess patent infringement damages against Plaintiffs. And because a determination of patent inventorship is a question of law (*see e.g., C.R. Bard Inc. v. M3 systems Inc.*, 157 F.3d 1340, 1352, *reh'g. denied & reh'g en banc declined* (Fed. Cir 1998), the Court is not bound by the jury's incorrect determination of inventorship of the patented design.

### III.
### THE JURY'S DETERMINATION OF PATENT INFRINGEMENT DAMAGES IS FLAWED

The jury answered Interrogatory No.7 with a patent infringement damage award of $10,800. The only possible basis for that number appears to be the result of multiplying 120 sets of eagle fairing guards sold by Mark Hoop and an average selling price of $90 per set. Consequently, the jury again failed to follow the Court's instructions on the law, because it

assessed as Defendants' damages the gross sales made by Mark Hoop, without any deductions for manufacturing and selling costs.

Clearly, if Defendants suffered a loss one measure of damages would have been their potential net profits from sales made by Mark Hoop, not Mark's gross sales. There was no accounting by the jury of net profits, because there was no testimony or other evidence as to what Mark's profits were, thereby rendering the damages award to be merely speculative and not based upon evidence in the record. By not subtracting from the gross sales figure materials costs, labor costs, machine-time costs, packaging costs, distribution costs, and related promotional, advertising, and selling costs, the jury applied an incorrect damages standard and awarded an amount in excess of any actual damages that might have been sustained. The jury's patent infringement damages award is yet another indication of jury confusion, and of its failure to follow the Court's instructions by awarding gross sales as damages instead of lost net profits.

Moreover, merely because an alleged infringer has made sales does not automatically mean that a patent owner is entitled to lost profits. In an *en banc* decision, the Federal Circuit set the standard as follows: "To recover lost profits damages, the patentee must show a reasonable probability that, 'but for' the infringement, it would have made the sales that were made by the infringer." *Rite Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) *(en banc)*. *See also, Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964) ("The question to be asked in determining damages is 'how much had the Patent Holder and Licensee suffered by the infringement. And that question [is] primarily: had the Infringer not infringed, what would Patent Holder-Licensee have made?"); and *Hebert v. Lisle Corp.*, 99 F.3d 1109, (Fed. Cir. 1996) ("When the patentee does not seek to make and sell the invention, lost profits are not an appropriate measure of damages"). Defendants made no showing that they would have made Mark Hoop's sales. In fact, Defendants made no sales of the thousands of sets

of eagle fairing guards they produced (Tr. p. 67, l. 16 – p. 68, l. 3), which belies any notion that they would have made the sales that Mark Hoop made. Certainly Defendants would be expected to have sold at least one set of their guards. But their failure to do so and their abandonment of the enterprise and withdrawal from the market (Tr. p. 66, l. 18-19) means that they would not have made the sales that Mark Hoop made. Consequently, Defendants are not entitled to any lost profits.

## IV.
## THE JURY MISAPPREHENDED THE CONFIDENTIAL DISCLOSURE AGREEMENTS

The jury found that Mark Hoop breached his confidential disclosure agreement (Answer to Interrogatory No. 24), but found no damages (Answer to Interrogatory No. 25). And it also found that Lisa Hoop breached her confidential disclosure agreement (Answer to Interrogatory No. 26), but found no damages (Answer to Interrogatory No. 27). Under Ohio law, however, "damages are an essential element of a plaintiff's claim for breach of contract." *Anchor v. O'Toole*, 94 F.3d 1014 (6th Cir. 1996), citing as authority for that proposition *Doner v. Snapp*, 649 N.E. 2d 42, 44 (Ohio Ct. App. 1994). Thus, without damages a contract is not breached, which exposes yet another inconsistency in the jury's verdict and a misunderstanding by the jury. The finding of breach of the confidentiality agreements should be vacated as to both Mark Hoop and Lisa Hoop.

## V.
## THE JURY MISAPPREHENDED THE CONTRACT ISSUES

### A. THE INITIAL AGREEMENT RELATING TO BUILDING A DIE

The jury concluded that there was a contract whereby Mark Hoop was to build a die (Interrogatory No. 28), that Mark Hoop breached that contract (Interrogatory No.29), and that Defendants' damages for that breach were $318,250 (Interrogatory No. 31). The jury also found

that Mark Hoop was entitled to payment for his services, which would have been the services relative to building a die, and that the reasonable value of those services was $36,000 (Interrogatory No. 37). Thus, although Mark Hoop allegedly breached the contract and owed damages to Defendants, he was entitled to be compensated for his services involved in performing the contract. The jury thus found that both parties breached the contract, because both parties were found to be entitled to compensation from the other party under the contract.

"To prove a breach of contract claim, a plaintiff must show the existence of a contract, *performance by the plaintiff*, breach by the defendant and damage or loss to the plaintiff" *Nilavar v. Osborn*, 137 Ohio App.3d 469, 483 (Ohio App. 2000); citing *Donor v. Snapp*, 98 Ohio App.3d 597, 600; 649 N.E.2d 42, 44 (Ohio App. 1994) (emphasis added). To prove the existence of a contract, a plaintiff must show that both parties consented to the terms of the contract, that there was a "meeting of the minds" of both parties, and that the terms of the contract are definite and certain. *Id.* at 484, citing *McSweeny v. Jackson*, 117 Ohio App.3d 623, 631, 691 N.E.2d 303, 308 (Ohio App. 1996).

The Hoop Brothers' breach of contract claim must fail in that the Hoop Brothers failed to show that there was a "meeting of the minds" of the parties and what the terms of the alleged contract were. The Hoop Brothers never produced a writing signed by the parties that spelled out what the terms of the agreement were. What was produced at trial seemed to indicate that the only "meeting of minds" between the parties was that Mark Hoop would build the eagle fairing guard die and the Hoop Brothers would pay him $49,500. See Manufacturing Agreement, (JX35) and Fine-Tech tooling cost statement ( PX23).

Mark Hoop built the die as proposed. The Hoop Brothers never paid him the $49,500. An essential element to succeed on a breach of contract claim is "performance by the plaintiff" (Counterclaimant in the case at hand). The Hoop Brothers never fully performed. The

Hoop Brothers' failure to pay for Mark Hoop's services in building the die relieved Mark Hoop of the duty to give them the die. The jury found that there was a contract between the parties, and that Mark Hoop breached the contract. However, the jury also found that the Hoop Brothers never paid the $49,500 ($36,000 balance) for the die. Mark Hoop cannot be liable for breaching the contract given that the Hoop Brothers failed to perform their end of the bargain.

The uncontroverted evidence established that Mark Hoop did indeed perform his part of the contract. He did so by building a die that produced eagle fairing guards that were accepted by Defendants. Indeed, the parts that Mark Hoop provided to Defendants as evidence of his success in die casting the parts were so good that Defendants had the parts photographed and submitted those photographs to the Patent and Trademark Office as part of their patent application (Tr. p. 116, l. 25 – p117, l. 4). They thereafter offered to Mark Hoop a so-called "Manufacturing Agreement" (JX35) in which they acknowledged a monetary debt to Mark (JX35, at page 1, section 2.1), they acknowledged that Mark had unassigned intellectual property rights and requested assignment by Mark of his intellectual property rights in the equipment he had developed (JX35, at page 2, sections 3.1 and 3.2), and they requested transfer of ownership in the equipment by Mark (JX35, at page 2, section 3.3). The presentation by Defendants to Mark Hoop of the terms included in that Manufacturing Agreement prepared by Defendants is the clearest possible evidence that the product of Mark's efforts in diemaking were acceptable to Defendants. Thus, Defendants tacitly acknowledged that Mark fully performed his obligations under the initial agreement made at the outset of the enterprise, an obligation that was an express assumption by Mark Hoop of the risk of failure, whereby Mark would be paid for his diemaking services only if he demonstrated he could build a die to produce the desired parts, which he did to Defendants' satisfaction. Defendants, on the other hand, never performed their obligation to pay Mark Hoop for his time and efforts in successfully building the contemplated die.

The jury's award of breach of contract damages to both parties is clearly inconsistent and contradictory.  Mark Hoop could not have breached the contract at a time the Hoop Brothers had not fully performed their obligations and still owed Mark $36,000.   As such, as a matter of law, the jury's finding that Mark Hoop was liable for breach of contract must be reversed.

B. <u>THE DAMAGES ALLEGED TO FLOW FROM BREACH OF THE AGREEMENT</u>

The jury's award of $318,250 as breach of contract damages (Answer to Interrogatory No. 31) cannot be based upon Mark Hoop's failure to perform and build a die. Indeed, Defendants have accepted that die and now have possession of it because Mark Hoop declined to post the required bond of $49,500.  If Mark had not performed by satisfying his self-imposed condition, Defendants would not have taken the die.  By their taking it they implicitly acknowledge that the die Mark Hoop built over a period of about six months is what they had bargained for in the first place, because it satisfied the self-imposed condition that Mark Hoop initially established – if a die could not be built to produce acceptable parts, then Defendants need not pay Mark for his diemaking services, but if an acceptable die were to be built to produce acceptable parts, then Defendants must pay for Mark's diemaking services.

Mark Hoop declined the Manufacturing Agreement (JX35) proposed by Defendants, which provided him no security for Defendants' payments of the amounts acknowledged to be due Mark under their proposed Agreement.   Moreover, the proposed Manufacturing Agreement also included in the proposed monetary amount two pieces of additional finishing equipment that Mark had and one trim die that Mark had not built. Mark then offered to Defendants a counterproposal (JX23, JX24, and JX25) that would have provided him acceptable security for Defendants' obligation to pay, and that also reflected the additional costs for the additional finishing equipment that Defendants had included in their proposed

-12-

Agreement, but which were not included in Mark's previously-presented cost figures. Defendants never responded to Mark's counterproposal (Tr. p. 52, l. 21 – p. 53, l. 10 and p. 130, l. 22 – p.131, l. 15). Instead, Defendants went ahead and had their own die made by a third party (Tr. p. 65, l. 15 – p. 66, l. 22) by utilizing the acceptable parts that Mark had produced and had given to them.

The only logical explanation for the jury's award of $318,250 for an alleged breach of the contract is an assessment by the jury of Defendants' alleged lost profits. But Defendants' alleged lost profits, if any, were the proximate result of their refusal to deal further with Mark, by not responding to his counterproposal, and also the proximate result of their own voluntary abandonment of efforts to make and sell the product (Tr. p. 65, l. 15 – p. 66, l. 22). The evidence does not show any further effort by Defendants to attempt to arrive at mutually agreeable terms relative to transfer of Mark's die. What the evidence does show is that Defendants, by having their own die built and by producing 10,000 sets of fairing guards (Tr. p.125, l. 9-16), made an unsuccessful attempt to swamp the market with their own product. And they now want to pin their failure to sell any of their parts on Mark Hoop when they voluntarily walked away from an opportunity to acquire Mark's die, and even abandoned their own efforts at marketing a product.

The jury's award of $318,250 as lost profits is based upon pure speculation, which is counter to the Court's instructions that damages cannot be remote or speculative (Jury Instructions, page 44, Breach of Contract – Damages). The only testimony relating to potential lost profits was that of Jeffrey Hoop, hardly a disinterested observer. Additionally, there was no evidence that Defendants' business entity was a going business, because there was no testimony about its business track record in terms of a sales history because it never sold any fairing guards (Tr. p. 67, l. 16 – p. 68, l. 3), nor was there any testimony from any economics expert, nor was

there any independently conducted market survey evidence, nor were there any records of similar enterprises engaged in similar or related activities upon which to base a credible lost profits assessment.    The only evidence before the jury was Jeffrey Hoop's speculative testimony of what he, an interested, non-expert observer conceived the market, the potential sales, and the potential profits to be.  Jeffrey Hoop's testimony was pure and unadulterated guesswork, and was without any foundation in fact.

The sheer magnitude of the $318,250 figure belies its credibility.  In fact, the evidence shows that Defendants' business prowess is negligible, because they themselves were unable to sell even one set of their fairing guards (Tr. p. 67, l. 16 – p. 68, l. 3) of the 10,000 sets they had produced for sale.  Instead of evidence of a flourishing, going business, the evidence is to the opposite effect - of an inept one, and one that Defendants quickly abandoned (Tr. p. 65, l. 15 – p. 66, l. 22) when they encountered a production problem that they did not diligently seek to solve.  If they encountered production problems and were serious about proceeding and in any way competent they would have made diligent efforts to solve their production problems. Instead, they took the easy way out – by abandoning the project.    Quitters should not be rewarded.

In a case in which the Federal circuit was confronted with a million dollar lost profits award it concluded:

> [The] evidence adds vague estimation and gross extrapolation to unsupported presumption. At every step, this damages calculation is fraught with speculation. Three pictures do not support a conclusion for 1600 stores. The Value Line report does not supply any information about Headrest sales. The five-year projection does not account for market fluctuations over time and does not relate to the three pictures or the Value Line report at all. Instead of presenting evidence of actual sales combined with reliable economic analysis of demand, supply, and price over time, Oiness invites the jury to engage in rapt speculation. Based as it is on insubstantial evidence, this court reverses the jury's $1,101,240 lost profits award.
> *Oiness v. Walgreen Co.*, 88 F.3d 1025, VersusLaw ¶33 (Fed. Cir. 1996) (copy attached).

And the Sixth Circuit has held similarly. *See, e.g., Anchor v. O'Toole*, 93 F.3d 1014 (6th Cir. 1996) ("Where a new business is involved, lost profits must be established 'through the use of such evidence as expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and any other relevant facts.'").

As in *Oiness, supra,* the evidence offered by Defendants in this case amounts to "vague speculation," "gross extrapolation," and "unsupported presumption." And Defendants' self-serving evidence does not include the type and quality of evidence that was identified by both the Federal Circuit and the Sixth Circuit as necessary in a lost profits assessment. Accordingly, the jury's lost profits award lacks substantial evidence and is therefore unwarranted.

### VI.
### THE JURY MISAPPREHENDED THE CONVERSION ISSUES

The jury found that Mark Hoop converted Defendants' property (answer to Interrogatory No. 32) and awarded conversion damages of $51,317 (Answer to Interrogatory No. 33), a number the source of which cannot be accurately ascertained. It is not apparent precisely what property the jury believed that Mark Hoop converted. If the damages assessed by the jury relate to the die that Mark had built, the jury's assessment would have had to have been based upon their conclusion that the Defendants were the owners of the die. However, that conclusion is clearly wrong because the Defendants never acquired a property interest in the die – they never paid for Mark's services in building the die, as the jury clearly appreciated (Answer to Interrogatory No. 36), which is yet another inconsistency in the jury's verdict.

One must ask, "How can an attentive, reasonably intelligent juror come to the conclusion that a person who made something for another with the expectation of compensation be held to have converted it when the expected compensation had not been paid and title to the

thing had not been transferred?" Defendants acquired no right to the die without having arrived at mutually agreeable terms with Mark Hoop, the owner of the die, for the transfer of ownership. Apparently, under the jury's understanding of the law one who fails to perform his part of a bargain gets to acquire the bargained-for property anyway, regardless of his failure to perform or his walking away from a proposed agreement for transfer of the property.

Mark Hoop's actions were reasonable with regard to his demanding assurance of security from Defendants by tendering a counterproposal in the form of a proposed Security Agreement (JX24) and a proposed Note (JX25) and in treating Defendants' failure to respond to his counterproposal as a repudiation of the agreement. In that regard O.R.C. § 1302.67 provides as follows:

> 1302.67. (UCC 2-609)  Right to adequate assurance of performance.
> (A)  A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party, the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return....
> (D)  After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

And O.R.C § 1302.77 provides:

> 1302.77. (UCC 2-703)  Seller's remedies in general.
> Where the buyer wrongfully...fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected ... the aggrieved seller may:
> (A)      withhold delivery of such goods....

Mark Hoop's withholding of delivery of the die, of which he clearly was then the owner, until adequate and agreeable arrangements concerning payment by Defendants were in place thus conforms with Ohio sales law.  Mark Hoop did not convert any property belonging to

Defendants, and the jury's finding against Mark Hoop in that regard and its award in favor of Defendants of $51,317 in damages are therefore contrary to law.

## CONCLUSION

The jury in this case failed to follow the Court's instructions regarding the applicable law as to each of the issues with which the jury was confronted. The jury's answers to several jury interrogatories were either inconsistent with each other, or they were inconsistent with the Court's instructions on the law that was required to be followed by the jury to resolve the issues based upon the evidence that was presented at trial. Based upon the jury's answers to the questions they were to answer as provided in the verdict form, it is clear that the jurors were either hopelessly confused, or, alternatively, that in their anxiety to quickly return to their normal daily activities after a five-day trial spanning ten calendar days, the jurors rushed through the 57 pages of jury instructions and the 37 jury interrogatories to avoid another day of jury service. Judgment as a matter of law in favor of Plaintiffs on all issues is warranted and is respectfully requested. Alternatively, amendment of the judgment in accordance with the foregoing or the grant of a new trial is requested to obtain a just result based upon a proper application of the law to the evidence. *See, e.g., Holloway v. McIntyre*, 838 F.2d 471 (6th Cir. 1988) ("We conclude that the jury verdicts in this case were inconsistent with the jury instructions and with each other, and the district court erred by refusing to order a new trial").

Respectfully submitted,

Alfred J. Mangels (0015981)
4729 Cornell Road
Cincinnati, Ohio 45241
Tel.: (513) 469-0470

Timothy A. Magee (0066023)
347 N. Main Street, Suite #3
Bowling Green, Ohio 43402
(419) 353-1856

Trial Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing PLAINTIFFS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL OR AMENDMENT OF THE JUDGMENT, together with the MEMORANDUM IN SUPPORT, the DECLARATION OF ALFRED J. MANGELS, and a copy of the decision in *Oiness v. Walgreen Co.*, were served upon trial counsel for Defendants this 23RD day of February 2004, by first-class mail, postage prepaid, addressed to:

Stella B. House, Esq.
STELLA B. HOUSE, ATTORNEY-AT-LAW, P.S.C.
Post Office Box 422
Manchester, Kentucky 40962-0422

Feb, 23, 2004
_____
Date

_____
Alfred J. Mangels
Trial Attorney for Plaintiffs