**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI**

| | | |
|---|---|---|
| Mark R. Hoop, et al., | ) | |
| | ) | Civil Action No. C-1-00-869 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | District Judge Susan J. Dlott |
| Jeffrey W. Hoop, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF ALFRED J. MANGELS

The undersigned, Alfred J. Mangels, hereby states that the attached pages numbered 52, 53, 65, 66, 67, 68, 98, 99, 100, 101, 116, 117, 125, 130, and 131 are true and correct copies of the corresponding pages of the transcript that has been filed with the Court of the Trial Testimony of Jeffrey Hoop given on February 10, 2004, day 4 of the trial of the above-captioned case.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on ___Feb, 23, 2004___          _____

Alfred J. Mangels

J. HOOP - DIRECT

1    A.    Security agreement.

2    Q.    And financing statement, Joint Exhibit 23?

3    A.    And I think an amortization schedule.

4    Q.    Yes.  And then there was a security agreement, which

5    is Joint Exhibit 24.

6    A.    That's correct.

7         MS. HOUSE:  Judge, I would like to inquire and be

8    certain about whether the amortization schedule is in the

9    Court's copy of the exhibits.

10        THE COURT:  Which exhibit are you referring to?

11        MS. HOUSE:  It is Joint Exhibit 24.

12        THE WITNESS:  25 in mine.

13        MS. HOUSE:  25.

14        THE COURT:  My Joint Exhibit 25 starts out by

15   saying cognovit note.  And then it goes on to promissory

16   note.  Yes, it does look like it has an amortization

17   schedule attached.

18        MS. HOUSE:  Okay.  I just want to make certain

19   before I put that on the screen.

20   BY MS. HOUSE:

21   Q.    Does this amortization schedule refresh your memory

22   about the dates?

23   A.    Yes, it does.  I'm thinking that I received this

24   around the 1st of March, because they were going to have

25   this set up to where my payment would be the 1st of April.

J. HOOP - DIRECT

1    Q.    Okay.

2    A.    And if you see at the top left, February 29, or top

3    right I should say.

4    Q.    And what were your thoughts when you received this

5    document?

6    A.    Well, by this time, the communication had already

7    broke down.  I wasn't going to do anything at all with him.

8    I was done.  I didn't want anything else to do with him.

9    Because, well, because prior to this was when I had sent

10   him the manufacturing agreement.

11   Q.    Okay.  So you -- who did you contact to prepare the

12   manufacturing agreement for you?

13   A.    Christine McLeod, my patent attorney.

14   Q.    And why did you decide to do that?

15   A.    Well, because I felt like I have gone through all this

16   time, and why start all over again.  And so I figured I

17   would just pay the 36,000, get my die, go have somebody

18   else do it and probably save the $36,000 and all the time

19   of doing the whole process over again.

20   Q.    And so, pursuant to that manufacturing agreement, you

21   were actually willing to --

22   A.    I sent a check along with it, a $1,000 check to Mark

23   with this agreement, and I had called him ahead of time and

24   made arrangements for my uncle to come over and pick up the

25   die, once Mark got his check for $1,000, so I could go shop

J. HOOP - DIRECT

1    Exhibit 4.  It's invoice number 23570.  And are you

2    familiar with this invoice?

3    A.    I'm trying to catch up with you.  Yes, I am.

4    Q.    And what does this invoice show?

5    A.    It actually shows that there was a notice of allowance

6    from the patent office allowing us to go ahead and submit

7    the fees for our patent application.  You don't pay all

8    your fees up front.  They give you a notice of allowance,

9    and then you send in your fees for the design issue fee.

10   And so, basically, that's what this is is my attorney

11   Christine McLeod sending me an invoice showing that there

12   was an allowance March 14, 2000 and that she needs to

13   submit these design issue fees.  And at the bottom you can

14   notice again Earl Hoop gave us the money to have that done.

15   Q.    Okay.  At this point in time, I believe that you and

16   your brother Steve decided to seek an alternative means of

17   producing the eagle design fairing guards?

18   A.    We did.  I had located -- or actually didn't locate --

19   it was right there in town.  In Ocala, Florida where I

20   live, there is a company called Clairson Industries, and

21   they build dies for ABS plastic.  So, thinking that, in

22   order to get good parts that we could go out and sell, we

23   thought it would be quicker if we go out and get these

24   plastic parts done and we will just sell them.

25        So we went to Clairson Industries and had them build

J. HOOP - DIRECT

1  us a die, and, when they finished building the die, we took

2  the parts to a company in Daytona Beach to have the parts

3  chromed.  But they were having problems in getting all the

4  gases out of the part, or they said with ABS that it might

5  be that the parts, they fall off a conveyor belt; they

6  don't have to go through the stamping process.  When they

7  come out, they're ready to go.  They fall out there, an

8  actual part ready to go.  They go down a conveyor belt,

9  and, when they go down the conveyor belt, sometimes the

10  oils off the belts or even the gases in the plastics

11  themselves will adhere and stay on that part.

12      So, when we went to chrome them, they all needed to

13  either be cleaned, or we couldn't get them to actually take

14  the chrome.  So we never did mass produce.  It was just --

15  and we were in the process of doing all this when this

16  lawsuit's filed against us.  So then I'm like, wait.  If we

17  have got to get this lawsuit, it's going to get expensive

18  with the attorney fees.  So I'm going to stop production

19  and going on with the manufacture of the plastic ones.  And

20  if I'm going to go and be sued, then I need to make sure I

21  have the attorney fees to pay for you to drive back and

22  forth from Florida.

23      Originally, we had several attorneys from Florida, and

24  it's just -- and then we had attorneys here.  By the time

25  you pay for all these attorneys, you drive back and forth

J. HOOP - DIRECT

1    from Florida, you have spent a lot of money.

2    Q.    Is this the product that was produced by Clairson?

3           THE COURT:  So you want to identify what you're

4    holding for the record?

5           MS. HOUSE:  Yes.  It is Joint Exhibit 30.  It's a

6    set of eagle fairing guards.

7    A.    Yes, it is.  That is our product, the plastic ones.

8    Q.    Is this the packaging that was produced by Target?

9    A.    Yes, it is.

10           MS. HOUSE:  Judge, I would ask that be passed to

11    the jury.

12           THE COURT:  All right.  And, whenever you get to

13    a convenient place, we will take the lunch break, too.

14           (Passing the exhibit to the jury.)

15    BY MS. HOUSE:

16    Q.    Why did you decide -- was there a reason why you

17    decided not to sell this product?  I know you have

18    mentioned some problems with manufacturing.

19    A.    If you'll look at the product itself, it's blurry.

20    It's, to me, it's not a quality part.  And so, even though

21    we have built another die, we have gone out and chromed the

22    parts, it still is not the quality that we want and what's

23    expected from people that are out buying Harley-Davidson

24    motorcycles that range in -- your Classics and Ultra

25    Classics are going to range from 16,000 all the way up to

J. HOOP - DIRECT

1   30,000 brand new.  They're going to want a part that is

2   impressive.  And we weren't satisfied with it, so we never

3   did sell any parts.

4          MS. HOUSE:  Judge, could this also be passed to

5   the jury?

6          THE COURT:  What is that?

7          MS. HOUSE:  This is Joint Exhibit 29.  It's the

8   metal version of the eagle design fairing guards.

9          (Passing Joint Exhibit 29 to the jury.)

10  BY MS. HOUSE:

11  Q.   I think your original poor man's patent indicated from

12  the beginning that you planned to cast these in metal; is

13  that correct?

14  A.   That is correct.

15  Q.   And so, basically, you were never satisfied with the

16  plastic version?

17  A.   That is correct.

18         MS. HOUSE:  Judge, I think, once the jury reviews

19  those, that it would be an appropriate breaking point.

20         THE COURT:  All right.

21         How much longer do you think your testimony is

22  going to be with Mr. Hoop?

23         MS. HOUSE:  I would imagine we could finish in

24  another hour at the longest.

25         THE COURT:  Mr. Mangels, do you have any idea how

J. HOOP - CROSS

1   time.

2   Q.   Do you believe your poor man's patent to be an actual

3   enforceable patent?

4   A.   My understanding is that the reason, the only reason I

5   did it was to protect myself.

6   Q.   Would that prevent somebody else from making the

7   article and give you a right to enforce something against

8   them?

9   A.   I think that would be up to a jury and a Court to

10  decide.

11  Q.   Okay.  So you didn't file a patent application at that

12  time, did you, a regular application I should say?

13  A.   No, I didn't at that time.

14  Q.   And why didn't you?

15  A.   I had the poor man's patent at the time, and I was

16  seeing patent counsel.

17  Q.   Really the reason is that it really wasn't a complete

18  invention at that time, was it?

19  A.   No.  It was complete at that time.

20  Q.   You needed a detailed drawing to show your invention,

21  didn't you?

22  A.   I actually needed a part to show the invention.

23  Q.   Now, the bird sketch that had been given to you --

24  and, by the way, as I understand it, that sketch that's

25  made a part of your poor man's patent was drawn by Mark

J. HOOP - CROSS

1   Hershberger, wasn't it?

2   A.    In the poor man's patent, yes, it was.

3   Q.    Okay.  And Mr. Hershberger didn't add any further

4   detail to that sketch after he had given it to you, did he?

5   A.    No.  After he gave me his sketches, no, he didn't add

6   any more at that time.  That was just one of the steps in

7   the process of when you get a patent.  See, my

8   understanding of patents, when you have an idea, you still

9   can keep your patent; the intent and the concept of it you

10  can keep.  You still have a right and you don't give up the

11  right just because you hire somebody to help you bring that

12  to light.

13  Q.    Right, right.  Okay.  Now, you didn't add any further

14  detail to that sketch either, did you?

15  A.    To the one that --

16  Q.    To the one that Mark Hershberger drew.

17  A.    I'm not an artist.

18  Q.    You didn't draw anything on that, did you?

19  A.    No, I'm not an artist.

20  Q.    You didn't make any detail, add any detail?

21  A.    It depends on how you want to look at that.  If you're

22  asking me if I actually took a pen and I drew it myself,

23  no, I did not.  Did I mentally give instructions to someone

24  to do it?  Yes, I did.

25  Q.    That's not the question I asked.

J. HOOP - CROSS

1   A.    That's what I'm trying to clarify.

2   Q.    The question was whether you had made any changes to

3   that drawing.

4   A.    Mentally, yes, I did.

5   Q.    But you didn't make any changes on the drawing or

6   write down any changes, did you?

7   A.    Not with a pen, no, I did not.

8   Q.    You know whether your brother Steve did?

9   A.    I don't think so.  I don't know for sure.

10  Q.    Okay.  Now, about those sketches, and we're talking

11  about the one that appeared in your poor man's patent and

12  there also was another sketch that was submitted to Lisa

13  Hoop; there is been some testimony about that.  You recall

14  that, don't you?

15  A.    Um-hum.

16  Q.    So, when you met with Mark and Lisa Hoop, you gave

17  them these sketches of a bird in flight, and the sketches

18  you gave them were all drawn by Mark Hershberger, correct?

19  A.    That is correct.  If you want to put them up so we're

20  clear we're talking about the same thing, it might make it

21  easier to understand.

22  Q.    I'm putting up on the screen Plaintiffs' Exhibit 25,

23  and the sketches that I was referring to are designated as

24  figure one and figure two on that.

25  A.    I think you might have left one out, though, because

1  there is another sketch that he did that had the actual

2  head that Lisa used in figure three.

3  Q.   I'm putting up on the screen Joint Exhibit 3.  Is that

4  what you're referring to?

5  A.   No, sir.  I'm talking about the one that has the

6  picture of one of those.  It has either figure one or

7  figure two in it, and it also has an eagle off to the side

8  that has a beak that is more defined than those in figure

9  one and two.

10            MS. HOUSE:  It's Joint Exhibit 1.

11            MR. MANGELS:  Thank you.

12  BY MR. MANGELS:

13  Q.   Is that what you're referring to?

14  A.   Yes, it is.

15  Q.   So those are -- that's another sketch that was drawn

16  by Mark Hershberger, right?

17  A.   That is correct.  Looks a lot like the end product.

18  Q.   Well, that's a matter of judgment, isn't it?

19  A.   Just your vision, I guess.

20  Q.   Now, when you went to visit your patent attorney,

21  Ms. McLeod, did you show her the sketches that are shown

22  here as figures one and two?

23  A.   Yes, I did.

24  Q.   And what did she say about those?

25  A.   As far as --

J. HOOP - CROSS

1   A.   Yes, I went to several companies and asked them if

2   they built dies.

3   Q.   Yes.  And they said they built dies.  And did they all

4   say that I will be glad to build a die for you?

5   A.   Yes, they all build dies.

6   Q.   Without seeing what it was they were to make?

7   A.   Yes.  They build dies is what they told me.

8   Q.   All right.  The folks that you spoke to, how much

9   detail did you go into in terms of what you told them?

10  A.   I didn't go in very much detail with them.

11  Q.   Um-hum.  Okay.  Now, when you approached Mark and

12  Lisa, you had looked forward to Lisa doing some drawing

13  work for you and Mark doing some die work; is that correct?

14  A.   When you say when I approached them.  Actually, Steve

15  was physically there talking with Mark.  I spoke to Mark

16  over the telephone.  I didn't even know that Lisa was a

17  graphic artist.  I didn't find out about that until a later

18  date when Steve actually took the -- I believe it was when

19  he took the confidential disclosure agreements up.  I think

20  that might have been the time when he discovered that Lisa

21  was a graphic artist.  I'm not certain.

22  Q.   Okay.  Have you ever visited Lisa Hoop's place of

23  business?

24  A.   No, I haven't.

25  Q.   Now, you testified that you received parts from Mark

J. HOOP - CROSS

1  Hoop and that, as a result of this, then you had some

2  photographs made that were incorporated into the patent

3  application?

4  A.    That is correct.

5  Q.    All right.  Again, just going back to the confidential

6  disclosure agreement, you didn't have Mark Hershberger sign

7  a confidential disclosure agreement, did you?

8  A.    No, I don't think we did.  But I wasn't making

9  arrangements to hire Mark at that time either to finish and

10  to do the drawing.  Had I made arrangements for him to do

11  it, I would have had him sign something as well.

12  Q.    He did make a drawing for you, didn't he?

13  A.    He made a preliminary sketch, but, as he testified in

14  here, we came and talked with Mark and Lisa, and Lisa ended

15  up preparing it for the U.S. patent for us.  $1,000 is

16  right on her invoice for U.S. patent.  It wasn't a big

17  surprise to her that we were doing this.  She knew we were

18  getting a patent, just like you did.

19  Q.    When did you tell her you were going to get a patent?

20  A.    When did I tell her we were getting a patent?

21  Q.    Yes.

22  A.    We were in the process of getting a patent, in the

23  patent process, reduction to practice.  What we were doing

24  is reducing our idea to actual practice.  That's, I think,

25  the legal terms they use when you get from an idea to

J. HOOP - CROSS

1   Q.   Yes.   So it means you had the money to have a mold

2   made, but you didn't have the money to pay Mark Hoop, did

3   you?

4   A.   That's his testimony.

5        THE COURT:   Mr. Mangels, I think that question is

6   argumentative.

7        MR. MANGELS:   All right.

8   BY MR. MANGELS:

9   Q.   Now, you had Clairson Industries make a number of

10  molded parts for you, didn't you?

11  A.   They did make some parts for us, yes.

12  Q.   Do you remember how many were ordered?

13  A.   I'm thinking it was 10,000 sets.

14  Q.   And a set would be 10,000 right-hand versions plus

15  10,000 left-hand versions; is that correct?

16  A.   That makes sense.

17  Q.   Now, there has been some testimony about the cost for

18  the die that Mark Hoop had put together, and I want to show

19  you Plaintiffs' Exhibit 23, which is a letter directed to

20  you, and it's a list of the costs for tooling in connection

21  with the work that Mark Hoop was doing; isn't that correct?

22  A.   Yes.

23  Q.   It indicates design and develop eagle die cast mold,

24  $36,000, and itemizes several items of tooling that were

25  not then completed.   Two-station trim die at 9,000 --

J. HOOP - CROSS

1   you can do it.  I don't know if $9,000 for his trim die

2   would be the way to go or not.

3   Q.   If you didn't have a die, you would have to do it by

4   hand, wouldn't you?

5   A.   I don't know.  You might be able to grind it off.

6           MS. HOUSE:  Objection, Your Honor.  He's not an

7   expert in building dies or --

8           THE COURT:  Overruled.  The witness can answer if

9   he knows.  Sounds like he doesn't know.

10          THE WITNESS:  I'm not sure.

11  BY MR. MANGELS:

12  Q.   Now, you said you wouldn't file for a patent

13  application until you had an actual physical part; isn't

14  that correct?

15  A.   That was a choice that we made.

16  Q.   And you didn't really have a physical actual part

17  until Mark Hoop gave you one; isn't that correct?

18  A.   That is correct.

19  Q.   All right.  So, without Mark's part, you couldn't have

20  gone ahead then?

21  A.   The part that I paid him to build, that is correct.

22  Q.   Now, after you had submitted the manufacturing

23  agreement to Mark and he had turned it down, you did

24  receive through his attorney and your attorney what is

25  known as a security agreement and a proposal by Mark where

1    he offered basically a counterproposal.  Do you recall

2    that?

3    A.    Would that be the one for 54,000 or something --

4    Q.    Yes.

5    A.    -- reflecting the cost of that other piece of

6    equipment that he had found?

7    Q.    Yes.  And in that arrangement it would have been a

8    payout period of five years, wouldn't it?

9    A.    I believe that's what it was, something like that in

10   there.

11   Q.    All right.  And you never responded to that, did you?

12   A.    No.  I was tired of the blackmail and the price

13   gauging from 36,000 to 54 now.  It just continued to

14   skyrocket.  Maybe next it would have been 100,000.  I'm not

15   sure.

16   Q.    Did you receive any indication that there had been

17   phone calls placed to you to get a response from you?

18   A.    I don't recall.

19   Q.    You don't recall.  Okay.

20          MR. MANGELS:  Just a moment, Your Honor, please,

21   to confer with co-counsel.

22          THE COURT:  All right.

23   BY MR. MANGELS:

24   Q.    Just one further question, Mr. Hoop.  The

25   manufacturing agreement whereby you would agree to pay